Good morning, and welcome to the Ninth Circuit. We'll hear argument first this morning in Bultemeyer v. CenturyLink. Mr. Hacker. Good morning, Your Honors, may it please the Court, John Hacker for Appellant CenturyLink. I'd like to try to reserve four minutes for rebuttal if possible. Just keep an eye on the clock. Will do. Thank you, Your Honor. Under the U.S. Supreme Court's decision in Safeco, a defendant cannot be held liable for a, quote, willful FICRA violation as a matter of law if its conduct is consistent with an objectively reasonable interpretation of the statute. That standard is purely objective. The defendant's state of mind is wholly irrelevant. As Your Honors are aware, courts look to three factors to determine whether the objective reasonableness standard has been satisfied. All three are easily satisfied here. First, CenturyLink's interpretation has a, quote, foundation in the statutory text. Under FICRA, credit reports are permissibly ordered when, quote, there's a legitimate business need in connection with a business transaction initiated by the customer and it is perfectly, excuse me, reasonable, if not outright correct, Your Honors, to say that business transactions here were initiated by the customer by the time CenturyLink ordered and obtained the credit reports. There was a five-step process, literally denoted five steps in the process, for submitting an order. First, you choose your services. You don't just visit the website. You go there, you choose your services, you then customize the services that you want, then you add them to your shopping cart, and then at step four, very importantly, you provide your customer information, billing information, and very importantly, you agree to the terms and conditions of the prospective sale. And then finally, at step five, you check out. The terms and conditions advise them that a credit report was going to be pulled? It says, the precise language of that is, a credit check is required to complete all online orders. Okay. Did it tell them that it would be completed at this step? By pushing this, a credit check will be pulled now? It did not add that. So the disclosure is a separate question, not at issue here, whether that disclosure was sufficient. The issue here, as the plaintiff's articulated below, is whether at that moment, when the credit report is pulled, after agreeing to the terms and condition, the customer has initiated a transaction, and the question then is, not only is that the correct interpretation of the statute, but whether it's reasonable. I'm not terribly adept at navigating the web. I'm an old guy, and so I've got my limitations. But when I see those terms and conditions, and I have been involved in a number of cases in which the terms and conditions were at issue. And when I see the terms and conditions, I ask myself, okay, did I want to pursue this with these folks to the next step, or don't I? Because this is strictly a contract of adhesion, and either I do or I don't, so I push the button or I don't. So nobody's going to read the terms and conditions. We appreciate that you've disclosed all of this in the terms and conditions, and you get the benefit of that. But it didn't tell them that the credit check, that by pushing the terms and conditions, that the credit check would be pulled then. And so the question is, when you've initiated the business transaction, I think it's still in play. Well, the problem is, well, first, two answers. One is sort of a meta-answer, which is, we don't have the burden here of establishing that we're correct. The question is whether it's reasonable to construe initiated by the customer as a situation like this, when we submit, you're in the midst of a transaction. And the second point, more technical and legal and equally important, is the buyer in a situation like this is the party that accepts the offer. When you submit, you're completing the transaction. You're not initiating a transaction. There's essentially nothing left to do at that point. You submit, the contract is complete, and the seller has a duty to deliver the goods pursuant to the contract that's been completed by the fact that you accepted the terms. Was it at step three that Ms. Bultmeier would have been informed as to what the likely fees were going to be? So, no, this is what's so important about it. It's after step four, and that's the reason, and this is not disputed. The reason that we requested a credit report at that stage was twofold. One was to prevent identity theft. Again, nobody disagrees with that, and that's a salutary objective. But also, two, we couldn't provide a final price until we had the credit report, because that would determine whether or not we needed to charge a deposit, because this is a sort of a delayed delivery, a delayed payment.  So it's hard to say that when you press the terms and conditions button that you've accepted the offer. I thought that's what you just argued to me. No, no. No, you accept the offer. My point is, you accept the offer at step five after that. That's completing the transaction. But you don't even know what the offer is at this point. I understand that, but you've initiated a transaction when the order is... But if you don't... But how can you initiate... How can you have a... If initiating a business transaction just means coming in and asking price, and you don't have an answer yet. Right. I understand that, but that's what's so different between RFACs and the coffee letter, the FTC coffee letter that they rely on. It's not just coming on a car lot, as in that case, and saying, you know, what are the prices? There's a much more detailed, bespoke process here that enables the transaction to be completed at the end of the process. Our submission is that the process has been initiated by the consumer because you're doing much more than just saying, what's the price? You're going through this whole process where you've identified the services that you want, you've had them customized, you've agreed to the terms and conditions that we talked about, and the only thing left for you to do is to complete the transaction. It's literally the opposite of initiating. I don't know what the terms and conditions get you. It just doesn't feel like that's, at the margins, a particularly significant step. It's something that everybody has to do in every website you go to. You don't have to accept that the terms and conditions are a critical red line. What I think is the ultimate, they're all steps in a spectrum, in a process that has been initiated by the customer. Surely, by the time, the last thing left to do is to complete the transaction. This is my point. The submitting that they rely on. She doesn't have a price yet. She doesn't know how much it's going to cost. How much could the deposit be? I mean, how much impact? You say you need the credit report to know whether to charge the deposit. How much are we talking about? I don't know the answer to that. I don't know if the record has an answer to it, but it definitely was material. That's the whole problem, is you don't want, as a seller, in this circumstance, the last thing you want is for a consumer to think, we hear all kinds of complaints about hidden fees, is to think that she's going to pay whatever it is, $1,000 a month, and then get a bill later, or get, after submitting what she thinks is the complete transaction for the services, to suddenly get a charge for $1,100, because there's a $100 deposit. The deposit is the material amount to somebody looking for this, and that's the reason that we were requesting at this time. But I want to emphasize, it's not just about the terms and conditions. It's a five-step process. When the credit report is ordered, it's at the very last step, where the last thing that has to happen is completing the process. If we think of the transaction narrowly as the actual formation of a contract to purchase the service, then it seems like the transaction has not been initiated by step four, because she hasn't clicked, I accept. So I take it you want us to think of, or at least to accept, that one could reasonably read the transaction to be something broader. What is that something broader? How do you define transaction, and why is that a reasonable reading? So two points, I would say, if I could just resist the premise a little bit, which is, even if you look at it as a— It's meant to be helpful, but— Well, no, no, but even if you look at it as the contract part, it's not initiating to accept it. That's completing the transaction. But that relates to the second point, which is, this is not a, I don't know, walk in and buy milk off the shelf, and it's kind of a one-act transaction. This is clearly an integrated, a transaction that's a process. Again, unlike in the coffee letter, when you show up on the car lot and just say, what are your prices? This would be to, and analogies I know are a little bit risky, but if you go onto the car lot, you select your vehicle, you look around all the vehicles, you select your vehicle, you sit down with the dealer, you choose all the customized features, all the particular, the floor mats, and the racing stripes, and all that. Then you get sent to the finance department, and you have a whole discussion with the finance department, and they do whatever they do to come up with a final price, and then you look at the price. Yeah, that's not been my experience. You may get sent over to the finance department, but usually you've got a bottom line by the time you're going over there. They may be talking about whether you're getting 0% on this vehicle on this day, or whether you're going to get 3% or something else, whether you're going to get 36 months or 60 months, but usually if you're dealing with your salesman, they have worked out and told you what the dealer prep is going to cost, and what the racing stripes will cost, and if you want the upgraded radio, and they've given you a bottom line. But to that point, why would you ever go over to the finance department? You have no clue how much this vehicle, and you're always surprised at what the bottom line is. Right, and this is why analogies are a little risky, but I think there's plenty of experiences among people where the bottom line changes at the financing stage, because that's what financing is all about. You're not offering a box of Tide laundry soap at $12.99. People can do some comparison shopping between Target and Kmart if they want to, but at least they've got a price that they're starting with. They've got no clue what things are going to be valued here, and it's going to change depending on their credit report. Why would they complete a transaction? Why would they even initiate the transaction until they know what the price is going to be? But again, I don't mean to be just repeating myself and hectoring, but they may or may not want to complete the transaction, but I think that presupposes that the transaction has been initiated. That's our submission. This is a process, unlike purchasing a car. I appreciate the value of the English that you've offered there and the difference between initiating and completing, but it seems to me that once we go to the coffee letter that you're in trouble, because the FTC has taken a slightly different view on this thing. Two points on the coffee letter. One I've already made, which is it's fundamentally different factually, but second, it's a non-binding letter, both the letter itself and the later document that it's been submitted to. In Safeco itself, the court said, when the FTC statement is non-binding. Well, they put the disclosure down at the bottom, but then they've repeated the coffee letter repeatedly in that 40-year report. It's been reified. But every single time they repeat it, they say these are not, whatever it is, the official views of the FTC kind of thing, so it's not promulgated regulation with any sort of status of law. Do you think there is such a thing as authoritative guidance from the FTC in a post-Loper Bright world? I think that's, I mean, all these principles were developed before Loper Bright. I take the point that after that, there's, you know, prior in a Chevron world and even a Skidmore world, there might be, it might have more status after that. I think there would be, you know, if it's duly promulgated and it's within their authority, sure, that would be, that would still be authoritative. So there is such a thing as authoritative guidance, but it wouldn't be the coffee letter by any stretch. Is this a question of law or of fact? I think this is a question of law, whether or not the statute can be understood reasonably. Again, this question here is not who's right or who's wrong, it's whether this interpretation was a reasonable understanding of the language as a matter of law, whether it encompasses these facts, which are not disputed. And no court has said to the contrary, and this court said, I think it was in Marino, that when there's not an appellate, when the statute itself doesn't explicitly answer the question, it's, you know, you're very likely not to have liability for a willful violation because there's no appellate precedent on point. So I think all of those factors together make clear that this, as a matter of law, can't be treated as a willful violation. And I'll just say one word to sort of preserve the opportunity of rebuttal if needed. The second question, which is that we have a class-wide judgment, right, of, that includes at least half the class that the court sort of later defined as the class, which is everybody that appeared on this abandoned cart, this modified abandoned cart report, didn't prove that they had a credit report pulled. There's just no showing of injury by any of them, by at least half. We don't know who or exactly how many, but it's not disputed that half of the people who were on the abandoned cart report didn't have credit reports pulled because our system didn't work that way. It was disputed in the sense that the district court said, your client came up with the list. Your client has the information, and your client didn't provide information that took out the names that didn't have a credit report pulled. So how is that anybody's problem other than your client? Because we didn't have the information. That's not accurate. It didn't exist.  The only party that could have.  TransUnion is the company that had it. They were required by law to keep it. That's your vendor. So who else is going to get that? They subpoenaed TransUnion and then didn't pursue the subpoena. It was their burden of proof to establish whether or not a credit report was pulled. They asked the correct party, the only party with the information. That can't be right. Your client was the one that pulled the reports. So how could your client be ignorant of what reports it had pulled and had? Because it had no statutory duty to maintain them. Its systems didn't maintain those records. It didn't need to. There's no reason for them to do that. It wasn't important to know whether or not they pulled the records. Why would they? That's not their job. It's the credit reporting agency's legal job to maintain those records. TransUnion had them. They correctly pursued it and then withdrew the subpoena. But if the class is defined as people who had credit reports pulled, isn't it? That's right. Okay. So, I mean, I guess I'm, it seems like your objection, I'm not sure I understand your objection, given that it would seem like definitionally everybody in the class. And that's precisely the problem is the thing, right? The court said, and it sort of kept saying in the process, we don't need to find out who those are because I've defined the class this way. But that's exactly what was going on in Ramirez, right? In Ramirez, there was 9,000 members of the class that were defined a particular way, but it turned out 6,000 of them didn't have a claim or there wasn't proof that they had a claim because they couldn't show that they were, they fit that class definition of having had their reports distributed. It's the exact same situation here. The class is defined one way, but that doesn't tell you who fits that class definition and who actually has a claim under that class definition. And that's what's missing here. The court just at the end of the case said, I sort of declare them to be the 56,000 members on this abandoned cart report, which to be clear, Judge Clifton, was from the very, very beginning we said was only a list of potential class members, not the class members, because we said over and over and over and over again, we didn't pull credit reports on everybody on the abandoned cart report. All right. We've taken you past your time. We'll give you two minutes.  Thank you. Thank you, Your Honors. Mr. Thompson. Good morning, Your Honors. May it please the court. My name is Russell Thompson and I represent Ms. Bultemeier in the class. After a decade of litigation and a four-day jury trial, a jury found that CenturyLink willfully violated the Fair Credit Reporting Act by impermissibly pulling credit reports. Well, but that is apparently a question of law. Indeed, your brief tells us it's a question of law, and we've just heard from your colleague that they think it's a question of law. So why are we dealing with a jury verdict and why are we dealing with arguments that this has been waived because they didn't present evidence on some subject? I've been mystified throughout my review of this case as to what we're dealing with here. Sure. I'm happy to clarify that for you, Your Honor. So what is not a question of law is whether CenturyLink pulled their credit reports, which the jury expressly found they did, questioned one of the verdict form, pulled credit reports on Ms. Bultemeier in the class. The other question was whether they did so willfully, which we think is a question of fact for the jury. CenturyLink agreed, presented it to the jury. What they're now arguing and what we agree is an issue of law is the affirmative defense that is the SAFCO defense. This is an— Why is that an affirmative defense? I mean, willfulness is an element of the cause of action. SAFCO says that objective reasonableness negates willfulness. That's not an affirmative defense, that just negates one of the elements of the claim, doesn't it? Well, numerous courts have called the defense—CenturyLink itself called it a defense in its opening brief and only— Oh, it's a defense, but that doesn't mean it's something that's affirmative like a statute of limitations defense that you're pulling in from the outside. They're denying the allegation of the complaint. But it is a defense because there's elements to it—  And saying that I didn't do it is a defense, but that doesn't make it an affirmative defense that puts the burden on the defendant. Well, even a statute of limitation defense is a defense that has to be proven based on the facts of the case, and likewise, their SAFCO reasonable interpretation defense has elements to it. They got one point to the less-than-pollucid statutory text, which they haven't done here. Well, the court has described this in those terms. You didn't make up that phrase yourself. No, the Supreme Court gave it to me. That's not really a factual issue they're going to have to prove to this jury. It's pretty well-established that this statute is not a model of clarity. Well, of course, but they have to tell us that. We would have taken discovery on the defense. Discovery about what? It's a question of law. Sure, but they have to point to what the text is that they're saying is vague. We could get an expert. You're telling you didn't know what the text of the statute was that they have to identify the text of the statute to put that at issue? No, I'm saying which portion of it. Because even now, they're saying it's initiate. That's the only thing they've argued. I don't think initiate is vague whatsoever. I think they're misdefining business transaction as any transaction. But your case is arguing that there's a difference between initiate a transaction and initiate a business transaction. And you have an elaborate explanation of why you think business—well, okay, we know what the issue was. I don't see how anything's being waived because they didn't argue that to the jury or somehow point to the words that you're telling us are important. I mean, we got all these obstacles before we get to what the case is really about, which is a question of law. Do they meet the standard of a safe-go defense? Sure, and they certainly don't here. As a matter of law, they don't make it. Again, they haven't shown—the last thing I'll say about the facts, they haven't pointed to what they've adopted as their reasonable interpretation because their interpretation has to be reasonable. The Supreme Court said they have to have adopted it, and they're putting out 20— I just don't understand this line of argument at all. I gave your friend on the other side a pretty hard time. I've got a lot of questions here. Sure, sure. I'll move on to the questions. The questions are going to go both directions. Of course. Of course they've argued that this is initiating a transaction, and their argument is that initiating has a variety of meanings. One reasonable meaning is you've gone to a website and you've started the process. You've worked through four of five steps here, and that initiates a transaction. The transaction's not completed, but it is initiated. I think there's some problems with that theory, but it doesn't strike me as totally unreasonable. Sure, sure. I hear you. So what I'll say is, I'll say is, you know, I don't think the statutory text is less than pellucid, but if the court agrees, I understand that. That said, I don't think it's a reasonable interpretation, one, for them to say a consumer who has not requested any services, has not agreed to pay anything, and has not submitted— Well, a consumer who doesn't know what the price is— Exactly. He identified one of the problems, which is that it doesn't appear to be a dispute that this is an effort to avoid identity theft, which is going to be a problem for both sides of this transaction if somebody else has stepped in and used your client's name. But they can't tell your client what she'll be charged unless they know the credit risk analysis that tells them whether to charge a deposit. So that strikes me as a pretty reasonable thing to try to ascertain before your client is given a yes or no bottom line, because otherwise they're stuck with saying, here's a price. Oh, by the way, if we do the credit check and discover you've got this bad rating, then we're going to charge you an extra $100. What's illogical about trying to pin down what the credit risk is before you actually quote a price to the customer? Sure. There's two problems with that. The first problem is CenturyLink's own problem. CenturyLink had two separate systems at the time, based on where the consumer was submitting the order from, because of another company that they acquired. So CenturyLink was not running this process on one system, but two separate systems. One was a legacy system, and one was their own. On one entire system, no consumer ever got charged a deposit at step five. Not a one. It was a process that occurred behind the scenes after the consumer submitted an order. So CenturyLink's process— So the consumer finds out later what the price is really going to be, and that's a good thing. Not for CenturyLink, because it shows that they did not have a legitimate need for the information when they were pulling the credit report, because they weren't even doing anything with that information until after somebody clicked a submit order. The other problem— Wait, wait, wait. Sorry. Isn't the basic problem here that you can conceptualize a transaction as just the formation of the contract, and that happens at step five, and I agree with you that that hasn't been initiated until step five. Or you can think of a transaction in kind of the way that the federal rules use same transaction or occurrence. Nobody would think that the different steps of the website were different transactions in that sense. So the transaction is the process of a person going to the website and investigating the service and then perhaps ultimately purchasing it, and that transaction was clearly initiated by the consumer. So why, if we have those two possible readings, why isn't there a range of reasonable ambiguity that their interpretation falls right inside of? And that comes to the second problem, is that, as one of your honors raised earlier, they weren't telling consumers this. They were telling consumers almost the exact opposite. Telling consumer—I mean, they don't have to tell consumers their interpretation of the transaction. No, but they were telling consumers a credit check is required to complete online orders. So they were telling consumers that, which, any understanding, I think, from that is, okay, well, if I submit an order, you're going to pull my credit, not when I click the next button. This isn't a misrepresentation claim. The question is, like, what was their position based on a reasonable reading of the statute, and I don't see why what they said about it has any bearing on that. Well, because what they've said in their opening brief is, obviously, a credit report must be obtained in connection with an actual customer-initiated transaction, not one that is hypothetical or foreseeable. And CenturyLink knows that any business transaction with consumers on their website is just that. It's only hypothetical until a consumer clicks Submit Order at Step 5. That accepts your limitation of the word transaction, defining business transaction as only meaning that last, I accept this contract even though you may change the price on me. And I don't understand that. The question posed by Judge Miller is, we use transactions in lots of ways. Most legal questions, there's a broader definition to decide what's related to or so forth. I don't have to decide what the best definition is. The question before us is whether the definition as understood by CenturyLink was unreasonable and was made unreasonable with guidance from either the language of the statute or court decisions, and I haven't seen any court decision from our court, certainly, or any other circuit court that's very close to this, or authoritative guidance, if it still exists after Loeb or Bright, and I frankly haven't seen that either. So what exactly is supposed to have put CenturyLink on notice that what it was doing was a violation of the Credit Reporting Act? Well, certainly the coffee letter put them on notice. Stop right there, because the coffee letter itself says that it's not authoritative guidance. No, but it was adopted by the FTC at a 5-0. Stop right there. What, I mean, this is a question of law, and I was looking all through the briefs to find, I heard a statement that you had a witness that said it was adopted by the FTC. I looked at the 40 years report. It does not say that. It's referenced multiple times in there to refer to it. It does not say, point me to something. It references lots of informal staff opinion, but by its own terms, it's a compilation by the staff. Right, to advise the CFPB, who at the time was taking over advisory purposes. Some formal adoption by the Commission itself. I mean, on the face of it, it plainly can't, because I can't imagine the FTC says, okay, everything that a staff member has said for the past 40 years is suddenly our decision as to how this should be interpreted. But they didn't do that. They selectively chose which one. They didn't do that. Point me to something in this 40 years report that comes even close to that. I don't have the report in front of me, but they did choose them not to. Well, that's a pity, because it's a question of law, and I have looked at the report. And I've got to tell you, I don't see anything remotely like that. So how does this become the authoritative guidance that you claim that it is? I mean, I would just rest on our position that we've said, and just, you know, have to respectfully disagree. But I would also say that it's not... Wait, you're respectfully disagreeing. I accept that, but you point me to nothing upon which to base the disagreement. How persuasive can that be? Well, I'm just pointing you to FTC 40 years that we disagree what it did. My understanding of the FTC 40 years is that the FTC chose which ones to include in the report and chose which ones not to include in the report. What's the source of that understanding? Just the website when... Well, if you read the report under introduction, the very beginning, you don't have to read very far into it. It says, the staff seeks to share its extensive experience with the CFPB and the public through a summary of its, the staff, key interpretations of guidance. And it's described as an FTC staff summary of interpretations of the FCRA, for end quote, staff summary, close quote. I don't see anything there that suggests the commission itself has decided that everything our staff has said over the past 40 years reflected in this report is adopted by us. Well, they said key interpretation. So they said, these are the ones that we think are the most important. But we use the staff. We is not the commission. Well, and then they adopted it though, 5-0. But I understand your position and I just have to respectfully disagree. But to step back, I think there's a misunderstanding of whose burden it is. The Supreme Court said, point to authoritative guidance allowing for more interpretations here. And here, I don't think, when we talked about transaction, if Congress wanted to use the broader frame. Actually, that's not how they described it in Safeco. In Safeco, the reason that Safeco won was that there was no authoritative guidance. Not that it was able to point to authoritative guidance saying it was right. But the absence of authoritative guidance. In Safeco, the language says authoritative guidance that allows for more than one reasonable interpretation. I don't want to quote. This is not a case in which the business subject to the act had the benefit of guidance from the courts of appeals or the Federal Trade Commission that might have warned it away from the view it took. That's a quote from Safeco. Sure, sure. And it's at a later point of it. But but if I later point, it's in the second to last paragraph. I've looked at what comes after that and I don't see anything that helps you. But either way, going back to transaction, Congress purposefully chose business transaction, not the broader transaction that's used in other statutes and rules. And CenturyLink is on... So business distinguishes it from a charity transaction. Correct, because that business modifies transaction, which requires service to the good. But this was a business transaction in terms of that distinction. The consumer was there to do business. So my colleague misspoke and he said, you click submit order and that's completing the transaction. That is patently false. CenturyLink has no obligation to give services. They can still deny it. That's just submitting the application to CenturyLink at step five. And they've admitted we don't have to give services then. We can still check that background report at a different deposit. That is not completing the transaction. That's initiating the business transaction. And you can't look at CenturyLink's interpretation and say, listen, I think it was reasonable that the consumer understood, because that's what everything breaks down to. And the courts have said the consumer has to understand they're initiating a business transaction such that they expect to have their credit pulls. Congress didn't want people to be surprised, like Miss Baltimore and the class, to have their credit pull. And who could ever reasonably expect to have their credit pulled when CenturyLink is telling you literally seconds before you click the next button, we need your credit pull, but only to complete this transaction. And as was stated earlier, these consumers are just price checking. You can't get to the price, their final price until step five. And then unfortunately for even half those consumers, or most of all those consumers, even at that page it says taxes, fees, etc. may vary. With respect to the copy letter, I heard you say just a minute ago that the Commission had approved it 5-0. What precisely did the Commission do? I was referring to the FTC 40 years. Yeah, right. What did the Commission do? Issued the, agreed to issue FTC 40 years. Did the Commission itself actually vote to issue the report? That was my understanding. It took a formal, is that in the Federal Register someplace? I can't point to it. What makes you think that they voted to issue it? Yesterday when I was re-reviewing it on the website, it said a 5-0 vote.  I do want to ask a question on a different subject. It will make you work a little over time. Your brief alleges economic injury to your client and to the class members, but I didn't clearly understand exactly what the injury was. Could you clarify that for me?  I think it was probably a little bit of trying to fit a square peg into a round hole. It's more of a financial, economic injury, putting them at risk for putting the sensitive data that CenturyLink didn't have into their hands and putting them at risk for identity theft. We tried to introduce their database. But we've talked about identity theft as something that this whole thing is designed to avoid, to make sure they're dealing with the person who really is the person who she purports to be. So, I mean, this becomes important because if we ever reach the issue of the measure for the punitive damage calculation and the appropriate ratio and so forth, the Supreme Court talks about four times the actual loss. So I started looking, well, what is the actual loss? And there's several references to economic injury, but none of them told me what it was. And then when I looked at the record elsewhere, there was a reference from some witness, and again, I apologize for not recalling which one it was. There are too many names there, who said that, well, this kind of utility check doesn't affect the credit score. So I said, well, what is it then that actually might have caused an economic injury to the plaintiff or any other class members whose credit reports had been pulled, particularly given that I didn't see any evidence that the credit report information was ever used thereafter for any purpose or even seen by human beings for the most part. It was a mini check, and they went on from there. So what exactly is the economic injury that's been proven here? So a couple things. So it does disclose on the credit report. There was no evidence introduced about utility pulls or anything in the record about it being a utility pull that doesn't affect scores. But even if it didn't affect scores, it's still on your credit report. And when lenders evaluate credit, they don't just get a score. They look at the credit report, they look at things on there, and that can influence if you have too many inquiries. Well, OK, what is there in the record that proves there actually was an economic injury suffered by a plaintiff or anybody else? We didn't allege. We only saw statutory damages. There was no evidence of putting that on. We have no record of an actual economic injury being suffered. No, it's the invasion of privacy and CenturyLink acquiring their sensitive PII, including complete social security numbers. Even Judge Logan actually expressed surprise at learning that CenturyLink was able to obtain credit reports on consumers without even having their social security numbers, and then acquiring complete unredacted social security numbers, credit inquiries. CenturyLink themselves obtained credit inquiries when they pulled reports, employment history, and things like that. But we have no evidence or no factual conclusion that support there was an actual economic injury suffered by a plaintiff or anybody else. No out-of-pocket loss, that is correct. We don't know if their data was included in the 2018 data breach that CenturyLink had. We also attempted to introduce their 10K PII. Well, you're offering me lots of speculation, but so far my question was, is there any evidence in the record or was there any proof or conclusion that there was an economic injury suffered? And the answer appears to be no. You're suggesting there might have been some other harm rippled through, and certainly there was a statutory remedy, statutory damages available, and the jury acted on that. But in terms of looking at punitive damages, that measure starts with a ratio based, as I understand it, on actual loss, and so far I'm not hearing a whole lot of actual loss. Well, it's based on compensatory damages, and this Court has said in Bateman v. American and it said that it did so for two main reasons. First, because the FCRA provides the consumer the option of recovering either actual or statutory, but not both. It supports the presumption that they serve the same purpose. And second, the statute allows for punitive damages, quote, which further suggests the statutory damages provision has a compensatory, not punitive purpose. All right. Is there any further questions? No. It appears there are no further questions. Thank you, counsel. Thank you. No more. Rebuttal? Thank you, Your Honors. Just a few quick points. One to pick up on questions were asked in Judge Miller's earlier question on the process. Clearly transaction can, not necessarily always or must, but can encompass the set of events that the federal rules refer to, an integrated or ongoing sort of process to reach a result, and that's clearly what the facts show, undisputed facts show, was going on here. The credit report was pulled when it was pulled, but the very, very, very end of the process before it was completed after, in this sort of sense, it was initiated by the consumer. There are no appellate cases that contradict this or even suggest in any way that this is not a reasonable interpretation. The only cases that the plaintiff cite are completely off point. There are cases like the Baker case that says it's not a business transaction when you're doing like opposition research, you know, on the plaintiff or the defendant in another case and you're pulling the credit report for that reason. That's not a business transaction. Do you have any cases that seem to support your view? They're not cases on this point on construing initiation. So everybody's sort of silent on this question. Right, which this court said in Marino, it counts in favor of the reasonableness of the interpretation. With respect to the coffee report, are you aware that the commission itself voted on this? Yeah, I wasn't aware of that in particular. I don't know that it was, you know, formally voted on. It's definitely not a regulation or something with the force of law, to go back to the Mead principle. And it says, the report itself says, it's not a binding authoritative statement. The report itself reports that. It's that particular commission's commentary at one point. But again, it's also factually off point. That's a situation where it would raise the question whether at the beginning of an ongoing process like this, that would qualify as initiation. I don't know. And this court doesn't need to decide the answer to that question, because we're talking about the very end of the process, right before it's completed. As to footnote of the reference to the hypothetical transaction, again, that would be a situation when you, you know, are contemplating someday maybe entering a transaction. You're not doing all the things that are required here to get to the very end. And then footnote 20, of course, if you look at that footnote, that clearly supports our position. It says the defendant's state of mind is not relevant. And no appellate court has said that you have to establish, show that you adopted, subjectively adopted a particular legal interpretation. That's what lawyers do. The Shimone case in the Second Circuit squarely rejects that proposition. The only question is one of law, which is whether it's objectively reasonable. And on these undisputed facts, it clearly was at least objectively reasonable. Thank you. Thank you, counsel. We thank both counsel for their helpful arguments and the cases submitted.
judges: CLIFTON, BYBEE, MILLER